UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States

    v.

Vongpasith Khamvongsa

Case No. 25-cr-45-SE-AJ-1
Opinion No. 2025 DNH 137

**O R D E R**

    In July 2024, a Somersworth, New Hampshire police officer stopped Vongpasith Khamvongsa for driving a vehicle with an expired registration sticker. The officer ran Khamvongsa's name and his driver's license number through the computer in his police cruiser and learned that Immigration and Customs Enforcement had an administrative warrant for Khamvongsa's removal from the United States. Additional officers arrived and, eventually, Khamvongsa was arrested and taken into police custody. Although the officers allowed Khamvongsa to call his sister to pick up his car, they subsequently decided instead to tow Khamvongsa's vehicle and conduct an inventory search. During the search, one of the officers found a gun and ammunition in Khamvongsa's backpack located on the front passenger seat. The government has charged Khamvongsa, who has a prior felony conviction as a habitual offender,[1] with one count of being a felon in possession of a firearm and ammunition and one count of being an illegal alien in possession of a firearm and ammunition.

    Khamvongsa has filed two motions to suppress any evidence recovered from his vehicle, both of which argue that the officers' search and seizure of the vehicle violated his Fourth Amendment rights. The first motion argues that neither the impoundment nor the search of the

---

[1] See New Hampshire Revised Statute Annotated § 262:23.

vehicle fell within the community caretaking exception or any other exception to the warrant requirement. The second argues that the officers did not have a lawful basis to detain or arrest Khamvongsa and that the evidence obtained as a result of the search of Khamvongsa's vehicle must be suppressed as fruit of the poisonous tree.

The court held an evidentiary hearing on October 23, 2025, and heard further argument on October 28, 2025. For the following reasons, the court finds that the officers violated Khamvongsa's constitutional rights when they arrested him pursuant to the administrative warrant, which the evidence shows was the sole basis for his arrest. Because they did not have the authority to arrest Khamvongsa, based on the specific facts of this case, the firearm and ammunition must be suppressed as their seizure from his vehicle violated his Fourth Amendment rights.

Background[2]

At approximately 5:45 p.m. on July 13, 2024, Somersworth Police Officer Jeffrey Slankard executed a traffic stop on a black Acura MDX because it had an expired registration sticker. Officer Slankard approached the vehicle and noticed that the inspection sticker was also expired. The driver, Khamvongsa, explained that it was his mother's car and that he was aware that the registration needed to be updated. At Officer Slankard's request, Khamvongsa provided his driver's license and the vehicle's registration.

Officer Slankard returned to his police cruiser and ran Khamvongsa's license number, name, and date of birth through his computer. In response, the computer showed that

---

[2] The court makes these factual findings based on the testimony and other evidence offered at the suppression hearing.

Khamvongsa was "unlawfully present due to order of removal or exclusion from the USA." Ex. C., Slankard Body Camera Recording ("Slankard Body Cam."), at 3:31. It further showed that Khamvongsa had an "outstanding administrative warrant of removal from the United States" and directed officers to "Contact LESC" at a number provided "for immediate hit confirmation and availability of [ICE] detainer."[3] Id.

Officer Slankard was unsure how to proceed because this was the first time that he had pulled over an individual that ICE apparently wanted detained. He radioed his supervisor, Sergeant Colton Deschenes, and requested that he provide assistance at the traffic stop. He also radioed his dispatcher, Sarah Bailey, and asked her to run a query to confirm that Khamvongsa had an outstanding warrant for removal.

Officer Slankard returned to Khamvongsa's vehicle to explain why the stop was taking so long and took his car keys. He told Khamvongsa that his computer showed that "immigration" wanted Khamvongsa because he was "supposed to be deported." Slankard Body Cam. at 6:14-6:20. They spoke for a few minutes. Khamvongsa protested that he had previously cleared up his immigration issues with ICE. Officer Slankard explained that he was still investigating and trying to confirm that ICE wanted Khamvongsa detained. Sergeant Deschenes and another Somersworth police officer, Officer Bryce Cantin, arrived on the scene while Officer Slankard and Khamvongsa were speaking.

---

[3] LESC stands for Law Enforcement Support Center, a service ICE provides to give information to and assist local law enforcement agencies regarding immigration matters. See, e.g., Arizona v. United States, 567 U.S. 387, 412 (2012).

Officer Slankard eventually went back to his cruiser with additional documents that Khamvongsa provided. He confirmed that the information in the computer matched the information on Khamvongsa's documents and accurately described Khamvongsa.

Officer Slankard returned to Khamvongsa's vehicle and told him that the officers had to take him into custody because of the ICE warrant.[4] Khamvongsa asked if he could call his sister to pick up his car and Officer Slankard told him that he could. While Khamvongsa was on the phone, Officer Slankard said that his sister had to arrive "quick." Slankard Body Cam. at 11:10-11:17. Khamvongsa explained that she lived just a few minutes away. Officer Slankard told Khamvongsa that an officer would remain with the vehicle to wait for Khamvongsa's sister. Khamvongsa exited the vehicle, and Officer Slankard handcuffed him and put him in the backseat of his cruiser.

After he was placed in the cruiser, Khamvongsa complained that his handcuffs were too tight. Officer Slankard asked him to get out of the cruiser so that he could loosen the handcuffs but, after he examined them, he and the other officers determined that they were loose. Officer Slankard explained to Khamvongsa that the police station was just two minutes away, placed Khamvongsa back inside the vehicle, and shut the door. He then said to Sergeant Deschenes and Officer Cantin that something seemed "off" and, referring to Khamvongsa's vehicle, "someone may just want to tow that f*cking thing." Slankard Body Cam. at 16:10-16:18. He directed Sergeant Deschenes to tow the vehicle and informed him that "it's unregistered and

---

[4] Officer Slankard wrote in his police report that he learned that Khamvongsa was a habitual offender during the traffic stop. He also testified at the hearing that he recalled learning of Khamvongsa's habitual offender status during the stop and arrested him on that basis as well, though he remembered being concerned primarily with the immigration issue. As explained further below, Office Slankard's memory of when he learned that Khamvongsa was a habitual offender was inconsistent with other evidence aduced at the suppression hearing.

uninspected." Id at 16:18-16:20. Officer Slankard and Khamvongsa then left for the police station.

Sergeant Deschenes requested a tow truck. He returned to Khamvongsa's vehicle to conduct an inventory search. Officer Cantin retrieved the paperwork for the search but, before he could reach the vehicle, Khamvongsa's sister arrived. Officer Cantin had a brief conversation with Khamvongsa's sister before walking over to the vehicle.[5]

By this point, Sergeant Deschenes had already placed several items that he had found in the vehicle on the dashboard and was looking through Khamvongsa's bag. Officer Cantin began filling out the vehicle inventory form, including the date and the vehicle's details. Shortly thereafter, Sergeant Deschenes pulled a handgun out of the bag and told Officer Cantin that he found a gun.

Sergeant Deschenes stopped the inventory search to radio Bailey for information about Khamvongsa's criminal record while Officer Cantin continued to fill out the form with details of Khamvongsa's vehicle. Sergeant Deschenes explained to Officer Cantin that it might be lawful for Khamvongsa to possess a firearm despite any immigration issues, but they would pause the search to learn whether Khamvongsa's possession of the gun was otherwise prohibited. If not, they could then resume the inventory search.

While the officers on the scene waited, Bailey radioed Sergeant Deschenes to let him know that an ICE agent was on the phone responding to the inquiry regarding Khamvongsa and

---

[5] The court assumes that Officer Cantin told Khamvongsa's sister that she could not take the vehicle because they had already called for a tow truck. However, there was no testimony regarding the details of Officer Cantin and Khamvongsa's sister's conversation. Officer Cantin turned on his body camera mid-conversation, and there was no audio during their discussion. The details of that conversation do not have any bearing on the court's order.

connected the call. Officer Deschenes explained to the ICE agent that Officer Slankard had executed a traffic stop on Khamvongsa's vehicle because it was unregistered and learned during the stop that Khamvongsa had a warrant for removal from the United States. The ICE agent confirmed that the agency wanted Khamvongsa detained.

During the call, Bailey radioed Sergeant Deschenes and informed him that Khamvongsa was a habitual offender, which Deschenes understood was a felony making his possession of the gun unlawful. As a result, Sergeant Deschenes told Officer Cantin that they would seize the car and apply for a warrant. The tow truck towed the car.

## Standard of Review

A defendant who moves to suppress evidence bears a threshold burden of showing that a Fourth Amendment violation has occurred. United States v. Young, 835 F.3d 13, 19 (1st Cir. 2016). This includes the burden of showing that he was subjected to a warrantless search or seizure. United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016). Once the defendant establishes that a warrantless search or seizure occurred, the burden shifts to the government to prove by a preponderance of the evidence that the search or seizure was lawful. See United States v. Matlock, 415 U.S. 164, 178 n.14 (1974); United States v. Manubolu, 13 F.4th 57, 69 (1st Cir. 2021).

## Discussion

Khamvongsa argues that Officer Slankard unlawfully arrested Khamvongsa based on a civil immigration violation and that the evidence obtained as a result of the search and seizure of Khamvongsa's vehicle must be suppressed as fruit of the poisonous tree. He also argues that

even if Officer Slankard had a lawful reason to arrest Khamvongsa, the search and seizure of the vehicle violated Khamvongsa's Fourth Amendment rights because they did not fall within the community caretaking exception or any other exception to the warrant requirement.

I.     Immigration Law Framework

"As a general rule, it is not a crime for a removable alien to remain present in the United States." Arizona, 567 U.S. at 407. However, "[f]ederal immigration officials may seize aliens based on administrative warrants attesting to probable cause of removability." Abriq v. Metro. Gov't of Nashville, 333 F. Supp. 3d 783, 786 (M.D. Tenn. 2018). Thus, although removal of an alien is a "civil, not criminal matter," Arizona, 567 U.S. at 396, "[a]rrests based on probable cause of removability - a civil immigration violation - have been long recognized in the courts," Abriq, 333 F. Supp. 3d at 786. The Immigration and Nationality Act (INA) gives "federal immigration officers" the authority to detain a noncitizen pursuant to an administrative warrant. United States v. Illinois, No. 25 CV 1285, 2025 WL 2098688, at *1 (N.D. Ill. July 25, 2025); Lopez-Flores v. Douglas Cnty., No. 6:19-CV-00904-AA, 2020 WL 2820143, at *3 (D. Or. May 30, 2020) (noting that it is "constitutionally permissible for federal executive officials to rely on the probable cause for civil removability provided in an administrative warrant to arrest deportable aliens" (citing Abel v. United States, 362 U.S. 217, 232-34 (1960))).

"Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." Arizona, 567 U.S. at 408. Some of those circumstances are set forth in section 287(g) of the INA, codified at 8 U.S.C. § 1357(g). Section 287(g) authorizes the Attorney General to enter into agreements with state and local law enforcement agencies to give their officers the authority to perform certain immigration-officer functions under ICE's

7

direction and oversight.[6] "Under such an agreement, a state officer is 'subject to the Attorney General's direction and supervision[,]' receives training in the 'significant complexities involved in enforcing federal immigration law,' and requires written certification that adequate training has been completed." Creedle v. Miami-Dade Cnty., 349 F. Supp. 3d 1276, 1302 (S.D. Fla. 2018) (citing and quoting Arizona, 567 U.S. at 409) (further citations omitted).

Even absent a 287(g) agreement, local law officers may assist with immigration enforcement in certain circumstances. Section 1357(g)(10) provides:

> (10) Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State—
>
> (A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or
>
> (B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

II.  Khamvongsa's Arrest

The government agrees that the Somersworth Police Department had not executed a 287(g) agreement with the Attorney General when Officer Slankard stopped Khamvongsa's vehicle and took him into custody. Therefore, the Attorney General had not granted Officer Slankard or any officer in the Somersworth Police Department the authority to perform immigration-like functions, including detaining a noncitizen pursuant to an administrative warrant.

---

[6] Such agreements are often referred to as "287(g) agreements."

Nevertheless, the government argues that Officer Slankard lawfully arrested Khamvongsa for three reasons. The government contends first that Khamvongsa's arrest was lawful because Officer Slankard was entitled to assist ICE in apprehending and detaining Khamvongsa under § 1357(g)(10). Second, Officer Slankard had an independent basis for arresting Khamvongsa because Khamvongsa was a habitual offender. Third, Officer Slankard at worst made a "reasonable mistake of law" that entitled him to arrest Khamvongsa. In the alternative, the government argues that the evidence should not be suppressed because the officers were allowed to tow and conduct an inventory search of Khamvongsa's vehicle under the community caretaking exception to the warrant requirement regardless of the lawfulness of Khamvongsa's arrest.

    A.    <u>Cooperation Under § 1357(g)(10)</u>

The government argues that § 1357(g)(10) authorized Officer Slankard to arrest Khamvongsa during the traffic stop pursuant to the warrant for his removal from the United States because the statute permitted Officer Slankard to "cooperate" with federal immigration officials to apprehend and detain aliens who are not lawfully in the country. In support of that contention, the government relies on <u>United States v. Ovando-Garzo</u>, 752 F.3d 1161 (8th Cir. 2014).

In <u>Ovando-Garzo</u>, a North Dakota state trooper executed a traffic stop on a truck for speeding. <u>Id.</u> at 1162. The trooper learned that the driver had a suspended license and arrested him on that basis. <u>Id.</u> After placing the driver in his patrol car, the trooper returned to the truck to speak with the two passengers and, eventually, both passengers admitted that they were unlawfully present in the United States. <u>Id.</u> at 1162-63. The trooper then contacted Border Patrol,

9

who "confirmed the passengers were in the country illegally and informed [the trooper] they would send an agent to take custody of the individuals." Id. at 1163. The trooper transported the passengers to the local sheriff's office to meet the agent. Id. After being charged with one count of reentry after removal, one of the passengers, Ovando-Garzo, moved to suppress the evidence of his immigration status that the trooper obtained during the traffic stop. Id. The district court denied the motion and the Eighth Circuit affirmed.

The Eighth Circuit held that the trooper's actions fell within the confines of cooperating with the Attorney General under § 1357(g)(10). Specifically, the court held that the trooper's "acts—identifying Ovando–Garzo, communicating with the Border Patrol, and detaining Ovando–Garzo until the Border Patrol agent could take custody—were not unilateral and, thus, did not exceed the scope of his authority." Id. at 1164.

The government's reliance on Ovando-Garzo is misplaced. In Ovando-Garzo, the trooper contacted Border Control and received confirmation on the passengers' immigration status. Border Control then requested that the trooper maintain custody of the passengers until an agent arrived. Here, the message on Officer Slankard's computer directed officers to call ICE about Khamvongsa's immigration status and someone in the Somersworth Police Department made such a call. But Officer Slankard had not yet received any response from a federal immigration official when he arrested Khamvongsa. As the government conceded at oral argument, the Somersworth Police Department did not receive confirmation from ICE that the agency wanted Khamvongsa detained until Sergeant Deschenes spoke with immigration officials more than 20 minutes after Khamvongsa's arrest.

This is the critical distinction. "Arizona v. United States makes clear that under Section 1357(g)(10) local law enforcement officers cannot arrest aliens for civil immigration violations

10

absent, at a minimum, direction or authorization by federal officials." Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 466 (4th Cir. 2013); Macareno, 378 F. Supp. 3d at 942 (holding that local officers were not entitled to arrest plaintiff under § 1357(g)(10) because "Plaintiff was detained before any contact with ICE and arrested before any confirmation of the ICE warrant. As a consequence, the Court finds these decisions were unilaterally made by Defendant Officers." (citation omitted)); Ochoa v. Campbell, 266 F. Supp. 3d 1237, 1256 (E.D. Wash. 2017) (noting that an administrative warrant alone "cannot be seen as a request, direction, authorization, or other instruction from DHS to Defendants seeking their assistance in detaining" an individual under § 1357(g)(10)). Thus, absent more, § 1357(g)(10) does not authorize a state or local police officer to detain an individual based on an administrative warrant for removal. Santos, 725 F.3d at 466 (holding that state officers were not authorized to detain the plaintiff under an outstanding administrative warrant under § 1357(g)(10) because an ICE agent did not confirm that ICE wanted the plaintiff detained until 45 minutes later). The government conceded at oral argument that it was an "appropriate characterization" of Ovando-Garzo to read it to require a state or local officer to verify with ICE that the agency wanted a noncitizen detained before taking him into custody. Indeed, if local law enforcement officers could unilaterally detain individuals under § 1357(g)(10) merely because they had an outstanding administrative warrant, it "would essentially render the purpose of 287(g) agreements meaningless." Lopez-Flores, 2020 WL 2820143, at *4 (quotations omitted).

For these reasons, Officer Slankard's arrest of Khamvongsa was not authorized under § 1357(g)(10). The court turns to the government's remaining arguments.

B.   Khamvongsa's Status as a Habitual Offender

The government argues that regardless of Officer Slankard's authority to arrest Khamvongsa based on the administrative warrant, the arrest was lawful because Officer Slankard became aware during the traffic stop that Khamvongsa was driving the vehicle while certified as a habitual offender, which is a felony under New Hampshire law. Officer Slankard's police report, which he wrote several hours after Khamvongsa's arrest, states that he learned during the traffic stop that Khamvongsa was a habitual offender. And Officer Slankard testified at the hearing that he recalled learning sometime during the traffic stop that Khamvongsa was a habitual offender. But the totality of the evidence shows that Officer Slankard did not learn of Khamvongsa's habitual offender status until after the arrest.

Officer Slankard's body camera footage captured the entire traffic stop, from a few moments before he pulled over Khamvongsa's vehicle until he arrived at the police station. The footage shows that the computer in Officer Slankard's cruiser did not indicate Khamvongsa's habitual offender status at any point, and neither Bailey nor anyone from dispatch informed Officer Slankard of Khamvongsa's status. Actually, Somersworth Police Department records show that Bailey first learned of Khamvongsa's habitual offender status at 6:41 p.m., well after Khamvongsa's arrest. And a Somersworth Police Department log of the traffic stop contains the following entry by Bailey at 6:45 p.m.: "Subject's NH DMV record was not found immediately due to DMV misspelling. Subject is a habitual offender . . . ." The evidence shows that Bailey radioed Sergeant Deschenes after the arrest and informed him, for the first time, that Khamvongsa was a habitual offender.

12

Although Officer Slankard testified that he recalled learning that Khamvongsa was a habitual offender during the traffic stop and included the same in his police report, that recollection is inconsistent with the other evidence adduced during the hearing. The court does not doubt that Officer Slankard testified to the best of his recollection regarding the traffic stop and attempted to describe the circumstances surrounding Khamvongsa's arrest accurately in his police report, which he wrote several hours after the traffic stop and after he learned of Khamvongsa's habitual offender status. Nevertheless, his body camera footage and the Somersworth Police Department records conclusively show that Officer Slankard was unaware of Khamvongsa's habitual offender status at the time of the arrest. Therefore, Officer Slankard did not have an independent basis to arrest Khamvongsa.

C.     Reasonable Mistake of Law

The government next argues that even if Officer Slankard did not have the authority to arrest Khamvongsa based on the administrative warrant, the court should still deny the motion to suppress because Officer Slankard made a reasonable mistake of law.[7] That argument is inapposite.

First, although an officer's reasonable error as to whether a defendant's conduct violated the law may justify a detention in certain circumstances, Heien v. North Carolina, 574 U.S. 54, 60-68 (2014), that is not what occurred in this case. Officer Slankard did not arrest Khamvongsa because he erroneously believed that Khamvongsa had broken the law. Rather, he arrested

---

[7] The court notes that the government does not argue that New Hampshire state law gave Officer Slankard the authority to arrest Khamvongsa on a civil immigration warrant, or that Officer Slankard believed that it did.

Khamvongsa because he erroneously believed that he had the authority to arrest him pursuant to the civil administrative warrant. This "kind of mistaken legal judgment—an error about the contours of the Fourth Amendment itself—can never support a search or seizure." Id. at 69 n.1 (Kagan, J., concurring) ("[M]istakes about the requirements of the Fourth Amendment violate the Fourth Amendment even when they are reasonable.").

Second, the government is wrong when it argues that Officer Slankard made a reasonable mistake because "case law from other circuits suggests [Officer] Slankard acted permissibly." Doc. no. 19 at 10. The cases on which the government relies hold that state officers may detain a noncitizen under § 1357(g)(10) only at the specific direction of federal authorities. See Ovando-Garza, 752 F.3d at 1164 (holding that officer's actions of detaining the defendant after communicating with Border Patrol, who confirmed that the defendant was in the country unlawfully and told the trooper that it was sending an agent to take custody of the defendant, were permissible under § 1357(g)(10)); City of El Cenizo, Texas v. Texas, 890 F.3d 164, 189 (5th Cir. 2018) (distinguishing Santos because Texas law had an "ICE-detainer mandate" which directly required local law enforcement agencies to comply with ICE detainer requests and detain noncitizens subject to detainers for 48 hours). That specific direction is absent here.[8] Indeed, as Officer Slankard repeatedly acknowledged during the traffic stop, the message on his computer directed him to contact ICE to confirm that federal authorities wanted Khamvongsa detained. He did not wait for confirmation before executing the arrest. The government points to

---

[8] In its objection, the government bases its argument, in part, on its contention that "dispatch confirmed that ICE wanted Khamvongsa detained" prior to Khamvongsa's arrest. Doc. no. 19 at 9. As mentioned, the government conceded during the hearing that the Somersworth Police Department did not receive that confirmation from ICE until after Officer Slankard had arrested Khamvongsa.

no case law that allows a state officer to detain a noncitizen pursuant to an administrative warrant under § 1357(g)(10) absent specific direction from federal authorities. As discussed above, case law consistently holds to the contrary. See Arizona, 567 U.S. at 407-10; Santos, 725 F.3d at 466. Therefore, even if a reasonable mistake as to the contours of the Fourth Amendment could support the seizure in this case, Officer Slankard's mistake was not reasonable.

### D. Community Caretaking Exception

Finally, the government argues that the issue of Officer Slankard's authority to arrest Khamvongsa pursuant to the administrative warrant is ultimately irrelevant. It contends that the officers had the authority to impound and conduct an inventory search on Khamvongsa's vehicle pursuant to the community caretaking exception to the warrant requirement. And, the government argues, because the officers located the firearm and ammunition during that constitutionally-permissible inventory search, the court must deny Khamvongsa's motion to suppress.

"The community caretaking function encompasses law enforcement's authority to remove vehicles that impede traffic or threaten public safety and convenience." United States v. Vick, 145 F.4th 191, 198 (1st Cir. 2025) (quotations and alterations omitted). "Pursuant to that exception, an impound decision is constitutionally valid so long as it is reasonable under the totality of the circumstances." Id. "The community caretaking exception also applies to an inventory search." Id. at 203.

Before addressing the government's argument, the court must explain the circumstances under which the community caretaking exception presents itself in this case. There is no doubt that Officer Slankard's stated concerns about Khamvongsa's vehicle implicate the community

15

caretaking exception. Officer Slankard told Sergeant Deschenes and Officer Cantin to tow Khamvongsa's vehicle because it was unregistered and uninspected. Under New Hampshire law, Khamvongsa's vehicle could not legally be driven under those circumstances. See RSA 261:40, 261:59-a, 262:32(V). And, as the First Circuit recently stated, "[t]hese are exactly the types of facts that implicate vehicle-related safety concerns under the community caretaking exception." Vick, 145 F.4th at 199. Officer Slankard also testified that he was concerned that Khamvongsa's vehicle was blocking traffic on a busy road, which is a specific ground for an officer to remove a vehicle under the Somersworth Police Department's Towing Policy. Doc. no. 14-9. The Somersworth Police Department also has an Inventory Policy that governs procedures for conducting inventory searches of impounded vehicles.

Thus, taking Officer Slankard's stated concerns at face value, the government is correct—the officers were entitled to both impound Khamvongsa's vehicle and conduct an inventory search regardless of his arrest.[9] But absent Khamvongsa's unlawful arrest, the gun and ammunition would not have been present in the vehicle at the time of the inventory search.

When Khamvongsa was arrested, he left his personal items in his car, including the bag containing the gun and ammunition that Sergeant Deschenes found during the inventory search. But, as the government acknowledged during oral argument, even if the officers had decided to impound and conduct an inventory search of the vehicle, absent his arrest, Khamvongsa would have been allowed to leave the scene with any items from the vehicle that he wanted, including

---

[9] Khamvongsa argues that the officers' motivation for seeking to impound and conduct an inventory search of Khamvongsa's vehicle was unlawful and the court should suppress the evidence seized from the car on that basis. Although the court disagrees with that argument in light of the First Circuit's holding in Vick and based on the evidence offered at the hearing, the court ultimately need not reach that issue.

16

his bag. There is no doubt that Khamvongsa would have taken his bag with him had he been allowed to leave, and the government did not argue to the contrary. Thus, any inventory search of Khamvongsa's vehicle would have been fruitless had he been free to leave.

In short, the government is correct that the officers would have been allowed to impound and conduct an inventory search of Khamvongsa's vehicle because of the motor vehicle violations even absent the arrest. But the government's victory on this point is a hollow one because an inventory search not preceded by an unlawful arrest would have yielded no firearm or ammunition.

III.  Summary

Khamvongsa's arrest pursuant to the administrative warrant was unlawful under the circumstances of this case and the officers knew of no other basis justifying seizure at the time. Although the officers had the right to impound and conduct an inventory search of the vehicle under the community caretaking exception to the warrant requirement, the gun and ammunition would not have been present in the vehicle during those actions but for the unlawful arrest. As such, the court grants the defendant's motion to suppress based on Khamvongsa's unlawful arrest.

Conclusion

For the foregoing reasons, the defendant's motion to suppress on the basis of the defendant's unlawful arrest (doc. no. 17) is granted. His motion to suppress based on the community caretaking exception (doc. no. 14) is denied as moot.

SO ORDERED.

_____
Samantha D. Elliott
United States District Judge

December 5, 2025

cc:     Counsel of Record
        U.S. Probation
        U.S. Marshal